Good morning. My name is Adam Romney on behalf of the separation plan that brought this appeal. We're going to reserve four minutes of time for rebuttal please. Obviously you've had opportunity to read the briefs. I don't want to read the briefs back at you. I think the important thing to keep in mind is that this is not a particularly difficult or novel set of facts or a case in the context of a personal jurisdiction matter. One of the things that I think is particularly clear when you look at the volume of cases cited is that this exact or similar situations have been discussed by both Supreme Court, district courts, and circuit courts multiple times. You know, it's the context of foreign vehicle manufacturers who are selling their vehicles into the United States and when those vehicles ultimately fail or cause injuries, there is ultimately a suit brought inside the district courts. The reason that it's happened over and over again is obvious. It's a mobile product. By its very nature, it's a product that travels around. It tends to move from one state to another and so this has been tested multiple times. We cited it in our briefs. Is there another case in which you have this asserted difference between the distributor corporation and the manufacturing corporation? I don't know of one. Another industry, when you say that kind of case? You're saying there are all these similar cases. Well, sure. I mean, so for example, we cited LW versus Audi AG, which is a case from this year that has been winding its way through post-Ford in the California appellate courts and that's a case in which it had the exact scenario that you're describing. I believe that it said that the assertion of jurisdiction was appropriate because the reason for the domestic distributors to exist was to facilitate that direct, continuous, and purposeful contact by the foreign manufacturer. So suppose that the domestic subsidiaries were not subsidiaries but were just entirely independent companies, but everything else in this case were the same. How would that change the analysis in your view? So there's two different, obviously, we're talking about an entirely different business model, so I'm going to give two answers to that. The first is, if it was an entirely different, you know, it's not a subsidiary, they sell many products, including cars, that is closer to a, I think of them as like the board game and toy cases, you know, like the KB cases that the defendants attempted to cite. In those cases, you know, there is a product and they are selling it to a Walmart, for example, and the thing is that that's closer to a true stream of commerce. It looks more like Asahi Metals because it is not a dedicated sales channel. The customer is ultimately that retail channel that sells everything. So in that case, it would be closer. The court would have to say, you know, is this part of a demonstrated and continuous contact? But this case is not close in that sense because it is the sole reason for these distributors to exist, is to sell this product into this channel, which is exactly LG versus Audi. So, I mean, to that extent, then, I mean, are you asking us to sort of impute the activity of the subsidiaries to the parent? Because, you know, I think there are a lot of cases that say, you know, absent some showing of, you know, alter ego, which I don't think you've attempted, that we're supposed to respect the corporate form and essentially treat the subsidiary as if it is a separate entity. You're correct. This is not an alter ego theory. What we are describing are the actual actions by the parent companies themselves. You can really see that that's true because our theory relies in large part upon the fact of a differential design, that it was the Korean companies who were making the decision to sell a vehicle and produce and manufacture them with a different design for the American market. And deliberately chose to send it to the port in California. Yes. It doesn't matter exactly where. There's some dispute, I gather, about where the ownership changed. Do we have any evidence that the distributors actually ever had title to these cars? Well, I think that that is actually kind of a sideline. First of all, I think that that is one of, in terms of the evidence itself, that's the LNS case that we cite in which any dispute about the facts themselves are supposed to be resolved in the plaintiff's favor. And there was a, we did have a discussion of a number of entries, I think there were eight or nine in the original briefing before the district court, that showed that the title was taken by the distributor themselves. And I think that the court improperly... And where and when? Before it got on the boat? After it got on the boat? While it was on the boat? We were saying that it was shipped by, those eight entries, they said it was shipped by the Korean company. So it was shipped to them and they did not take title until after the boat. Now, the defendants in this case, what they said is that those were clerical errors and they submitted a declaration to that effect. But LNS Enterprises is clear that that means that there is a dispute on the facts. And we cited a case that was Data Discovery versus System Tech Associates that says that it is not possible for the district court to weigh affidavits and determine credibility. So in the event that there is some dispute about that... Recording stopped. In the event that there is some dispute about that issue, that is supposed to be resolved in our favor. But I take it your principal legal theory is that it doesn't really matter where title passes? That's correct. I think that's a sideline issue. You know, this is part of what we describe is that it's the contacts themselves and it's the business model that's set in place by the Korean companies. You know, they are the ones who made these decisions to create a specific model of these cars that was designed only for the American market. The language, I think, of Ford in particular really goes that this is a continuous, it is a designed path in which those vehicles are designed for this market. That is a design strategy set by the Korean companies. It is a sales strategy set by the Korean companies. It is the American companies themselves cannot ever be the ones who are saying. So you allege that this design defect was designed particularly for the American market? Yes. That is a primary allegation in the complaint. And this is actually one of the reasons that this is important that the Korean companies need to be in the case. One of the arguments that the defendants have made is that it shouldn't matter as long as there is a solvent company. But because the design decisions themselves are made at the Korean manufacturer level, having the Korean defendants in is important for actually prosecuting the case for liability and discovery. But in terms of evidence of that allegation, it's primarily, I guess, it's more allegations. I don't know if we have any declarations or anything that show that these defects were not in the cars that were shipped to Canada and Europe. I don't believe that. Is there any documentation of any of this? Oh, that is absolutely true. I mean, for one thing, there is a, I mean, first of all, this was not disputed by the defendants. That was not the basis of their dispute. So is that, and from there, you're from that fact, you're concluding that there was a decision made to make a different design for the United States? Yes. And that's it? Well, that is the most obvious and clearest one. You know, the reason is being is that this is the part in question, which is an engine immobilizer, had to be included as a standard feature in, for example, Canada, but it was introduced as an optional trim package so they could upsell customers in the United States. Now that decision that in every other country in the world, it is mandatory, it is always in. But here in this market, that part is not included as a standard package, means that that design without that part could only have been purposefully directed at the United States market. Is there any discovery that you could and would do that would be helpful in resolving this? There would be discovery, but it would require us to have the Korean entities in the case. And that's actually what we've seen play out in the discovery in this case. There is jurisdictional discovery. Well, that's, I think that that could be jurisdictional discovery, but I think that, you know, Your Honor, I think we saw at the district court level, the district court, you know, seemed to suggest that, you know, enough evidence already existed to, well, I understand that. But if you, if we thought that this was at all close, would it make more sense to have more discovery and what would it be? Well, yeah, I think that the discovery we had initially asked for would try to drill down on this issue. And, uh, but again, what, what, what was the, oh, again, this is, it would be, what was the extent, who made the decisions? What was the differential design? What was the trim pattern? So that kind of like decision-making at the Korean company level. And do you think that would be appropriate jurisdictional discovery? Well, I don't think that we need to get there because again, this is not, that there is a differential design. It was not really disputed. I don't think that, uh, I don't think that is in dispute, but to the extent that it would be helpful, it would be appropriate to grant us jurisdictional discovery rather than simply dismissing the case outright. I have one other question. This may be not, not worth worrying about in this case, but Asahi and the follow-on case in the Supreme Court, um, who's Nicastro or something like that, neither of them had a majority opinion on the, um, stream of commerce theory, but nonetheless, everybody's always taken them as having decided that the stream of commerce wasn't good enough. Do you have any idea how we have gotten here? How we got to? I mean, are we to take it, I mean, you're saying this isn't really a stream of commerce case, but I don't know that there is a stream of commerce case. I mean, the Ninth Circuit seems to think there is one, maybe. No, I mean, so remember Asahi actually said that, you know, the stream of commerce by itself wasn't good enough. But that was a plurality opinion. I know, but what I'm going to, but what I'm going to say was then shined on by the majority of justices, which is that if there was something more, which is the quote from Asahi was, if the manufacturer created, controlled, or employed the distribution system. Yes, that's right. And that is exactly the allocation that we've made here with this action. So I mean, in your view, would it be, is it the case that basically any time you have a foreign manufacturing company that has a U.S. subsidiary whose function is to distribute the products in the U.S., and I would assume in that situation, like inevitably the products get shipped by somebody, either by the foreign parent or the U.S. subsidiary. Somebody ships them here. The parent obviously knows that they're going to be shipped here and intends that. So is there jurisdiction over the parent in basically all of those situations? Yeah, I think that we would say as long as you are shipping it to that market. I can imagine, for example, like trans-shipment situations where, you know, let's just say it was shipped here, but the port was only used intermittently because it was actually going to South America. I mean, that would be one where they did not purposely direct the shipment to this market, for example. They didn't avail themselves even though they put it on the boat and knew it would touch here. I think that actually, one case that was decided by this circuit, it was actually your opinion, you know, Justice Board laws, Shopify, you know, where it's going to be Shopify, man, I think that that is actually useful because that is a case in which it is more abstracted. It's about computer cookies that were, you know, sort of put onto people regardless of where they were. And one of the arguments that they had made was to say that their sales practices, because they were digital, is they were jurisdictionally nowhere except in their principal place of business by virtue of that business model. And this court rejected that argument. And so if that is not, if that argument were even like digital. Rejected it because the Supreme Court rejected that argument in Ford. Exactly. And Ford is the argument that we think applies here. Ford adopted the Daimler-Chrysler, the Daimler, you know, decision as truly binding, you know, on all courts. And that's part of the reason that we brought to you all the new Samsung case, you know, from the Fifth Circuit in May, which recognized that that decision was ultimately affecting a sea change in this area of the law. It is a thing that is almost indisputable. I don't know how it is that they could possibly get out of it because it is on all fours. It describes, you know, what happens when you have a vehicle directed to California with a California plaintiff who is injured in California. That is this case. So the district court didn't have the benefit of Ford and Shopify, I don't think. No, Shopify was decided in May, but it is the law here. But Ford was prior. Ford was previous. I don't know if the district court had the benefit of Ford. Well, it did have the benefit of Ford. Ford was decided in 2021. But Ford is really about a rising out of a related to it. It doesn't change the meaning of purposeful availment, or do you think it somehow does? No, I don't think it changes the meaning of purposeful availment. And I think that part of the reason, I know I tried to reserve more time, so I will answer your question, but I don't think it changed the meaning of purposeful availment. I think part of the reason that Ford said, we acknowledge that this other line, this other reasoning in Danmuir-Kreisler's controlling is because it was a recognition that that was how the courts across the country were actually applying it. That was a recognition of reality. So it didn't change anything, but it was essentially instructed, this is the law. And yes, what you saw the Fifth Circuit say is, we now recognize that this is the law. So I'm going to reserve the rest of my time. All right. Thank you, counsel. Yeah. I'll give you a couple of minutes for rebuttal because we took you over, but you're out of time. Okay. Thank you. Okay. Thank you. Good morning, your honors, and may it please the court. Andriana Kostanek on behalf of Hyundai Motor Company and Kia Corporations. The concession that was just made by counsel that his theory of jurisdiction would mean that every manufacturer, every foreign manufacturer would be subject to U.S. jurisdiction, not just U.S. jurisdiction, but California specific jurisdiction. If they use a third party to distribute a good to the United States market, that concession cannot be overstated. Well, I don't know that he said third party, and that's really the question he said, or a subsidiary affiliated party, a totally dedicated party. Yes. And that matters, your honor. To go to Judge Miller's questions, it matters that this is an independent subsidiary. So, the relationship here is there is corporate separateness between the subsidiary and the foreign parent companies that- So, suppose this independent distributor had decided that it wasn't going to sell any cars in California, that we're taking all the cars that get to the California part. We decided we're not having any, we're not distributing any cars to California anymore. Are we supposed to believe that the company in Korea would say fine? I'm sorry, if the subsidiary said, I'm not going to sell cars in California. I don't know what you would believe in that situation, but the unambiguous record evidence here that is not disputed is that there is a process of manufacturing and designing in Korea that the Korean corporations only do business in Korea. They sell those vehicles in Korea and title passes in Korea. Everything after that point is the exclusive responsibility of the U.S. subsidiaries. Right, but I guess this is sort of picking up on Rizan's point. It's not like they hold an auction at the gate of the factory and then somebody buys them and who knows what happens after that. I mean, like, they have created an entity to sell them in the United States. They are, we can sort of debate where the title passes, but like they are putting them on the boats to ship them to the United States. So it does seem like there is action, even if we just look at what they're doing, there is action directed at the United States, isn't there? Along those lines, how do you distinguish our decision in Yamashita where the defendants qualified as purposeful availment of Hawaii's jurisdiction by shipping products through the port of Honolulu? So if I can take the first question first, because I think that this matters a lot. So where there is a U.S. subsidiary and there is a corporate separateness in between them, we are told by the Supreme Court that you need to respect that corporate separateness. So in fact, even last term in a case called Dewberry, a trademark case before the Supreme Court, the court said yet again, it is long settled as a matter of American corporate law that separately incorporated organizations are separate legal units with distinct legal rights and obligations. But the distributor did not make the decision to ship the cars through the port of California. And that's why my follow-up, because I know that was your answer from reading your briefs, My follow-up is, then how do you distinguish Yamashita? Because it was the Korean company that made the deliberate decision to ship through California. There is zero evidence in this record that there was a deliberate decision by the parent companies to ship into the port of California. The evidence that does exist comes from the declarations that were provided by HMC and KC, the Shin and the Byak declarations. And they say that the subsidiaries control everything from the point that it gets onto that ship. They have legal responsibility. I thought it was put on the ship and the ship was going to California. Correct. I mean, if the point is that they knew that it was going to California, we know from the plurality opinion in Jay McIntyre that their foreseeability, the idea that they could foresee that it was going to California is not the same. With Asahi and Jay McIntyre, those are plurality opinions, and the majority of the justices seem to be saying otherwise. I'm sort of mystified by why everybody cites them as if they're controlling. Well, because Justice Breyer and Justice Alito had a concurring opinion in Jay McIntyre, and while it was limited to the facts, there is a very important statement in the Breyer opinion that says that he does not agree with the decision of the Supreme Court of New Jersey in that case, which had adopted a rule that sounds a lot like the questions that you're asking here. So he specifically rejected a rule that, quote, would permit every state to assert jurisdiction in a products liability suit against a domestic manufacturer who sells its products made anywhere in the United States to a national distributor. So that's what we have here. This is the analogies that were drawn by Justice Kennedy in his plurality opinion that simply because you know that your goods are going to end up in a particular state is not enough to create purposeful abatement. On this record, who shipped the product? Who chose where the product was going to be shipped to? The record is silent on that question, Your Honor. The record does not reflect definitively who made that choice. However, it's a fair inference from the facts that are in the record, including the declarations that the decisions over where the goods were received and where they were distributed to in the United States was actually a decision by the subsidiaries. They handle all contracts. They handle all issuing issues with respect to the distributors in the United States and the dealerships. The problem is, really, is it's just not a believable story. I mean, the notion that Hyundai Manufacturing Corporation in Korea is indifferent as to whether any cars are sold in California just can't be the case. Well, I guess I disagree, Your Honor. I think it is very believable that they have set up their business in a way where they manufacture and they sell in Korea. They have U.S. subsidiaries, which, as Judge Miller had noted, are not alleged to be alter egos or agents in this situation. That's very important. That was waived below. It's waived on appeal. They do not pursue the idea that there's like a lack of corporate formality here. So, they are putting these vehicles into a stream of commerce via what's considered under very established corporate law to be independent third parties. And they do that in all kinds of different countries, including to the United States. They don't differentiate between the states, and this is reflected in the arguments with respect to the design of these vehicles, too. None of that is California-specific. I'm sorry, go ahead, Your Honor. To change the... We're about to argue the consumer cases. In those cases, the Korean entities are the defendants, and there was no personal jurisdiction objection. Well, that's not quite correct, Your Honor. There was a stipulation reached. There was consent in those cases by the foreign parents. It's clear on the record that that same stipulation was offered to the plaintiffs in the subrogation track, and they rejected it. And so, that is an express consent by the foreign parents to be subject to jurisdiction in those other tracks due to an agreement that was reached with respect to how discovery would be conducted. You said a moment ago that the record doesn't reveal who made the decision about where the ship's going to go when they put it on the ship. Why should they not be entitled to jurisdictional discovery to investigate that question? Well, first of all, two reasons. The first is that it is very clear that the jurisdictional discovery below was just a fishing expedition. They put it... They had 30-some requests that ranged everything from the economic analyses of immobilizers to the decision to distribute to other locations. Okay. Well, that may be, but limited to this question.  Yeah, putting that aside, because... But it is important to what the procedural point that I'm going to make, which is that the district court said to the plaintiffs, you know, I'm going to deny this motion for jurisdictional discovery without prejudice. At record page 1616 of the ER in this case, the district court said, you know, you can come back. Let's brief jurisdictional discovery here, and you can come back with pinpoint discovery requests if there are specific facts that you think are, you know, a hole in your theory, you can come back to me. And the plaintiffs chose not to. So I think at this point, it's waived. They never came back and asked for the court to, you know, reconsider or to, you know, have a more limited discovery request to the court for something like what you're saying here. And actually, I understood the argument here of my friend on the other side to say, you know, we don't need jurisdictional discovery. That's not important to us. If I can take one moment and talk about the Shopify decision, because, you know, I understand that this came out after the district court's opinion in this case. I strongly disagree that this opinion is beneficial to the plaintiffs. So first of all, the case was not about corporate structure. So Shopify was a unitary company. It did all of the activities, including in California by itself. So it didn't involve a third-party distributor or a third-party subsidiary. And in fact, the California contacts of that corporation were the polar opposite of HMC and KC. So in this case, we have no contacts with California. All we have is this unadorned stream of commerce theory where they're putting these vehicles into the stream of commerce through a court in California. And the contacts in Shopify were, you know, the idea that they didn't need to be California-specific is because they had contacts everywhere. So one quote from that opinion is, Shopify knows about its California consumer base. It conducts its regular business in California. It contacts California residents. It interacts with them as an intermediary for its merchants. It installs software onto their devices in California, and it continues to track its activities. In other words, there was substantial business and purposeful direction in that case. And this case, of course, is a purposeful availment case, not a purposeful direction case. But all of those contacts are wholly absent on this record, nor is the injury felt here in California. And if I can spend one moment talking about the Ford case, because as Judge Miller noted, it really is about the relatedness prong and not about purposeful availment. Purposeful availment in Ford was conceded. The court called it a veritable truckload of contacts across the United States that made it unnecessary to, you know, deal with purposeful availment. But on the relatedness prong, what Ford says is that there has to be, you know, a relationship between the state. And in Ford, that was the injury having occurred here. Bristol Myers, which, you know, postdates Ford, says where the link to the state is simply that goods are being distributed via a distributor in the state. But the injury and, you know, the sale in question to the particular plaintiff didn't occur in the state. There's no specific jurisdiction. That is this case. The contacts in this case are nationwide. There is no identification, zero identification in the complaint of any California injury. Any vehicle that was stolen in California. Any insurer that insured a particular insured in California. All of that is absent from the complaint. And to the contrary, the complaint spans all 50 states. It alleges injuries across the different states, including ones that are not limited to California. So this is a Bristol Myers situation. I thought it had a whole bunch of state specific allegations. Yes, there are state specific allegations insofar as they say, you know, under New Jersey law, we bring New Jersey negligence claims, etc. And that's precisely my point, is that they do not identify any particular vehicles or insureds that were located in California. And to the contrary, there is all kinds of injury, vehicles, insureds that are outside of California that don't have, that don't satisfy that relatedness prong of specific jurisdiction. And that matters, because as we know from the cases that do exist and the clear statements that do exist in the stream of commerce context, specific jurisdiction is very different than general jurisdiction. You need not only those contacts and purposeful availment with the jurisdiction, but also the link to the litigation. I recall, this is not a case from state court, it's a case from federal court. The rule that requires that there be California connections is a statutory rule, is that right? It's not the kind, and there is nationwide jurisdiction under certain circumstances. So there's no constitutional problem here. Well, I don't think that that's quite right, Your Honor. So they invoke 4K1, which borrows the California long arm statute. And then the California long arm statute, in turn, is coextensive with the federal constitution. So it says, we are as broad as the due process clause allows us to be. Yes, but as far as federal court goes, the requirement is not constitutional. That has to be the case, because there's national jurisdiction of a lot of statutes. I suppose, except for that we know from cases like Ford, that the limitations on the state being able to exercise its jurisdiction is provided by the due process clause. There has to be minimum context of satisfying- Yes, but minimum context with what? With California or with the nation as a whole? Why do they need to be specific to California, is what you're asking? That's because of the statute, it's not because of- Well, so Jay McIntyre says it's a forum by forum, sovereign by sovereign analysis, because each sovereign has to have the ability. And here, we're borrowing the California long arm statute due to E or E. Was McIntyre's case from state court? McIntyre, I don't know if it arose from state court or not. I mean, there's discussions about sovereigns and so on is from the state court. I think it did arise from state court, Your Honor. But this isn't a case where nationwide, I mean, they specifically invoke 4K1, which is a state long arm statute, and so it has to have- Because the statute says so, but it's not constitutional. That's all I'm trying to point out. I don't know that I agree with that, because the California courts could not interpret, and the federal court interpreting California law could not interpret the long arm statute to be broader than what the Constitution allows under the 14th Amendment, I think. I see I'm out of time, so if there are no further questions from the panel, we would ask that this court affirm the district court. Thank you, counsel. I said I would give you two minutes to respond. I'll try to make it quick. So first of all, I want to address this, you know, California versus 50 state thing right off the bat. This is a real red herring. Remember, this is a multi-district court litigation. Ultimately, the reason there are 50 state allegations is the defendants requested that there be a single master complaint filed at one point that included all- Why are we looking at California Connections in particular? What was that, sir? Why are we looking at California Connections in particular, or are we? Because that is where the MDL court is located, and when they actually brought the motion itself, they cited the California court as being the one that applied. But if it's an MDL, and it was the courts that moved it over there, you wouldn't think it would- It's funny. We literally looked into this issue yesterday, and what we landed on is actually- Part of the answer is because the purposeful availment of the foreign manufacturer has a differential design that goes to the United States, and those vehicles end up in all of the different states, that whether you do it by 50 state, by 50 state, or you do it just by California, the answer ends up being the same. But I think your problem is less if it's national, because these cars were obviously going somewhere in the United States, whether they were going to California. It's pretty obvious they were going to California, too, but it's more obvious that they were going somewhere in the United States. Yes, and it's particularly obvious with these vehicles they were going to California. As you put it, it is simply not a believable story that the foreign manufacturers had no idea, and that's the exact same argument that was rejected in Audi. And didn't care. I mean, the notion that they didn't care. It would have been fine if we said, we're not going to sell any cars in California. That argument was rejected. The quote from Audi is that Audi, through its dedicated distributor, VWGOA, intentionally places vehicles into the regular flow of commerce to the United States, including to California. Since I've got 10 seconds left, the last thing I want to say, and I will answer another question, is they have conceded to us, they did not mention at all the issue that disputes between the factual record that we had our affidavit from a person who looked at the customs records and the customs records themselves. To the extent that those conflict with their affidavits and declarations, that's supposed to be resolved in our favor. And the district court did not do that. That was conceded by them. They didn't address it at all. That by itself is reversible error that should lead to a vacation of the order. Do you have another question? No, I don't. Thank you. Okay. Thank you very much. I appreciate your tolerance with me going on slightly over time. Yes. No, thank you. Thank you both, counsel. The first Kia Hyundai case will be submitted, and we're going to take a five-minute recess before we return for the second one, so counsel can get all settled. All rise. Court stands in recess.
judges: WARDLAW, BERZON, MILLER